NEMOURS FOUNDATION, Plaintiff,

v.

GILBANE, AETNA, FEDERAL INSURANCE COMPANY, Pierce Associates, Inc., Defendants.

Civ. A. No. 83–58–JJF.

United States District Court,
D. Delaware.

March 27, 1986.

David A. Dial (argued), of Smith, Currie & Hancock, Atlanta, Ga., Stuart B. Young, of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for Nemours.

Francis S. Babiarz (argued), and Robert K. Beste, of Biggs & Battaglia, Wilmington, Del., for Pierce Associates, Inc.

Richard R. Wier, Jr., of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., for Gilbane.

## OPINION

FARNAN, District Judge.

At this late juncture in a long and complicated proceeding the plaintiff, The Nemours Foundation ("Nemours"), has filed a motion to disqualify counsel for the defendant in this case, Pierce Associates, Inc.

("Pierce").[1] The case began originally as three separate actions, all filed on April 5, 1983,[2] concerning disputes which arose during the construction of an addition to the A.I. DuPont Institute Children's Hospital in Wilmington, Delaware (the "Project"). Remaining to be resolved is a civil action involving Nemours, Pierce, and Gilbane Building Company ("Gilbane"), the main contractor on the Project. Pierce was a subcontractor to Gilbane. Gilbane filed a counterclaim against Pierce and asserted third-party claims against Nemours, the architect of the Project, and Furlow Associates, Inc. ("Furlow"), the Project's mechanical engineer. Nemours, in turn, filed a counterclaim as well as a direct claim against Pierce, whereupon Pierce filed a counterclaim against Nemours. In Nemours' motion to disqualify, filed on October 4, 1985, Nemours requests the disqualification of the entire firm of Biggs & Battaglia ("Biggs"), Pierce's local Wilmington counsel, from further representation of their client. Nemours alleges that Biggs has a conflict of interest due to the former involvement of one of its present associates in this litigation as a former associate of Howard M. Berg & Associates ("Berg"), counsel for Furlow and co-counsel for Nemours at the time.

## BACKGROUND

Much of the factual background is not in dispute. Paul A. Bradley, the attorney whose former representation of Furlow has raised the issue of disqualification in this case, was admitted to the practice of law in February 1983 while he was employed at Berg. He began his employment there on September 7, 1982. (Docket Item ["D.I."] 728, ¶ 3.) Bradley became involved in the litigation in April 1984, when he assisted Howard M. Berg, who "made all decisions regarding the representation of Furlow." (*Id.* at ¶ 5.) Bradley's responsibilities as a low-level associate involved preparing for a "mini-trial" among the parties in efforts to reach a settlement agreement. Bradley prepared the materials for a set of books to be distributed to the party participants and the arbitrator. Most of his consultation with experts concerned these materials. (*Id.* at ¶ 11.) Bradley also reviewed documents for Berg's client, Furlow, which included documents produced by Nemours, the party moving for the disqualification of Biggs in this case. (*Id.* at ¶ 9.) Bradley further attested in his affidavit submitted to the Court that, having reviewed thousands of documents, he presently (November 1, 1985) has no recollection of the content or existence of any documents that potentially were covered either by the work product doctrine or attorney-client privilege. (*Id.* at ¶ 12.) To the best of his knowledge, Bradley's involvement in the Furlow case terminated after the end of the mini-trial. (*Id.* at ¶ 13.)[3]

Bradley subsequently did not follow the litigation, review any discovery materials, or attend depositions concerning Furlow. He stated that he had no way to determine if any conversation he had while representing Furlow or any document involved in that case has been disclosed beyond the purview of the attorney-client privilege or

---

1. Jurisdiction over this action arises under 28 U.S.C. § 1332(a) and venue is properly laid under 28 U.S.C. § 1391(a).

   The parties dispute which side is plaintiff and which side is defendant. However, Pierce points out that although it has been the plaintiff in the context of the entire litigation, the Court has ordered that for purposes of preparation of a pretrial stipulation and in order of proof at trial, Nemours will be treated as the plaintiff. (Docket Item ["D.I."] 730 at 5.)

2. These actions, now consolidated, are entitled *Pierce Associates, Inc. v. Gilbane Construction Co.*, C.A. No. 83–195, *Dynalectric v. Gilbane Building Co.*, C.A. No. 83–194, and *Gilbane Building Co. v. The Nemours Foundation*, C.A. No. 83–192. Two related actions were subsequently consolidated in this action: *Ernest DiSabatino & Sons, Inc. v. The Nemours Foundation*, C.A. No. 83–58 and *Honeywell, Inc. v. Gilbane Building Co.*, C.A. No. 84–99.

3. Bradley stated that to the best of his knowledge he did not meet with Nemours' attorneys or their clients at any time after the mini-trial. He did attend a brief meeting to discuss settlement, but no attorneys from Nemours, Pierce, or other clients were present. Finally, he did some research on the proper form of Release and Stipulation of Dismissal to be filed with the Court. (D.I. 728, ¶ 13.)

work product doctrine. (D.I. 728, ¶ 14.) When he interviewed for a position with Biggs, he did not know of its involvement in the present litigation and had no conversation with anyone concerning his work for Furlow before being hired. (*Id.* at ¶ 15.)[4]

It is apparent that Biggs was completely innocent of any knowledge of Bradley's involvement in the litigation, as was Bradley of Biggs' until Bradley met Jack Rephan, an attorney for Braude, Margulies, Sacks & Rephan ("Braude, Margulies"), Pierce's main counsel, when Rephan visited Biggs' offices approximately in May 1985. Bradley and his superiors at Biggs immediately decided that Bradley would have no contact with the Pierce litigation whatsoever and would not discuss it. Bradley himself resolved that he would not discuss the litigation or prior representation of Furlow "in any way with anyone" at Biggs. (D.I. 728, ¶ 19.) He further attested that he has never been asked by anyone at Biggs or Braude, Margulies concerning his Furlow representation. He does not nor never has known the location of the Pierce files at Biggs. (*Id.* at ¶¶ 22, 24.)

Victor Battaglia described his firm's procedure of "screening" Bradley from the litigation. All attorneys in the Pierce litigation must report to him. Biggs has a central file room, but since the actions of the litigation were consolidated, and long before Bradley was hired, all Pierce files have been kept directly adjacent to Robert Beste's offices. (D.I. 726, ¶ 6.) Furthermore, the only documents in the file are pleadings and other documents filed and of record with the Court, and previous drafts of filed documents. (*Id.* at ¶ 7.)

## ANALYSIS

On this motion for disqualification of Biggs, this Court is faced with two major issues. The first question is whether Bradley's previous involvement on behalf of Furlow in this litigation calls for his disqualification. Pierce argues that an attorney-client relationship never existed between Bradley and Nemours and contends therefore that there is no conflict of interest. The Court must address this issue first to determine the extent of Bradley's own involvement in the litigation, a necessary step in addressing the second issue. The essential discordance between Nemours' and Pierce's positions centers on whether this involvement of Bradley, now associated with Biggs, requires the disqualification of the entire firm of Biggs, as Nemours argues it should. Biggs contends that it has effectively "screened off" Bradley from any involvement or contacts with the Nemours litigation. This defense has been commonly termed the "Chinese Wall" defense. In ruling on this motion, the Court has coined the term "cone of silence" as a more accurate description of the ethical commands involved and the policies at stake.[5]

This Court clearly has the power to supervise the ethical activities of the attorneys who practice before it and, if necessary, disqualify those whose conduct breaches the norms as established by the bar.

> Whenever an allegation is made that an attorney has violated his moral and ethical responsibility, an important question of professional ethics is raised. It is the duty of the district court to examine the charge, since it is that court which is

4. Since then, Bradley's contacts with anyone involved in the litigation were limited to the following. He became aware that Biggs represented Pierce when he met Jack Rephan, of Braude, Margulies, Sacks & Rephan, at Biggs' offices, probably in May 1985. He merely greeted him and helped him carry several sealed boxes to an elevator; they did not discuss the litigation. On the same day, Victor F. Battaglia and Robert Beste, attorneys at Biggs, also became aware of Bradley's prior involvement. They briefly discussed only the fact of his representation of Furlow. All agreed, and Bradley was so advised, that he should not discuss the litigation with anyone. Finally, he walked a Pierce employee to a federal grand jury hearing after gaining permission from Victor Battaglia. To the best of his knowledge, the hearing had nothing to do with the Nemours and Pierce litigation. (D.I. 728, ¶¶ 16–18.)

5. *See infra* note 11 and text of opinion.

authorized to supervise the conduct of the members of the bar.

*Richardson v. Hamilton Int'l Corp.*, 469 F.2d 1382, 1385 (3d Cir.1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973). This power includes the authority to order disqualification. *Id.* at 1385–86. In ruling on the present motion, the Court will refer to the recently promulgated Delaware Lawyers' Rules of Professional Conduct ("Rules").[6]

### A. *Disqualification of Bradley*

Nemours alleges that the conflict of interest originates with Bradley, thus leading ultimately to the disqualification of Bradley and his firm. Bradley, as an associate at Berg, worked on the current litigation as counsel for Furlow. At that time, Furlow was a co-defendant of Nemours. As counsel for Furlow, Bradley was privy to confidences of both Furlow and Nemours as both planned "strategy sessions" in concert against Gilbane. This "commonality of interest" necessitated a sharing of work product, attorney-client privileges, and other confidential information. (D.I. 723 at iii.) Nemours further states that it "became clear to the parties involved ... that Pierce was the primary cause of the problems which were encountered during the construction of the Project and which were the bases of the ensuing litigation." (*Id.* at ii.) After intense negotiations, Gilbane, Furlow, and Nemours entered a series of agreements to settle or to dismiss claims. During this entire period, according to Nemours, the interests of Pierce—whose counsel is Biggs, Bradley's new employer— were adverse to those of Furlow. (*Id.* at iii.) Applying the Rules to this set of facts, specifically Rule 1.6 on confidentiality, Bradley is disqualified because the information he gained from Nemours was confidential information which must be protected, because Nemours must be considered a "client" of Bradley. Under Rule 1.9, Bradley cannot represent a client whose interests are "materially adverse" to the interest of the former client.

Pierce argues that Nemours cannot be considered a former client of Bradley for purposes of Rules 1.6 and 1.9. Nemours was merely a co-party of Furlow. The presumption that confidential information has passed to an attorney, which arises in the context of the attorney-client relationship, therefore does not apply. Nemours must prove that confidential information actually did pass from Nemours to Bradley, which it has been unable to do. (D.I. 730 at 15.)

Analysis must begin with the Rules. Rule 1.9, which deals with conflict of interest, reads as follows:

### Rule 1.9 Conflict of Interest: Former Client

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or

(b) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 would permit with respect to a client or when the information has become generally known.

Several requirements arise from this provision. First, the lawyer must have had an attorney-client relationship with the former client. Second, the present client's matter must either be the same as the matter the lawyer worked on for the first client, or a "substantially related" matter. Third, the interests of the second client must be materially adverse to the interests of the former client. Fourth, the former client must not have consented to the representation after consultation. The second part of the provision lists the conditions on

---

**6.** The Rules became effective October 1, 1985. The Delaware Supreme Court repealed Delaware's Code of Professional Responsibility and replaced it with the Delaware Lawyers' Rules of Professional Conduct. Since the Court is applying its ruling prospectively concerning Bradley's current employment with Biggs, it is clear that the Rules should be applied.

the use of the information relating to representation of the former client.

Rule 1.7, which Rule 1.9 references, provides guidance for determining when the interests of two clients are adverse:

### RULE 1.7 Conflict of Interest: General Rule

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation....

This provision applies to both simultaneous representation of two clients, or successive representation, where the attorney-client relationship has been formally terminated, which characterizes the case at hand. The duty involved is one of loyalty to the client.

The Third Circuit has only begun to construe the Rules as applied to conflict of interest. *See In Re Corn Derivatives Antitrust Litigation,* 748 F.2d 157, 161–62 (3d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985). The overwhelming bulk of precedent has been based on an interpretation of the Code. A brief review of the relevant portions of the Code is therefore necessary.

Canon 4 of the Code provides: "A lawyer should preserve the confidences and secrets of a client." Ethical Consideration 4–5 states:

EC 4–5 A lawyer should not use information acquired in the course of the rep-

resentation of a client to the disadvantage of the client and a lawyer should not use, except with the consent of his client after full disclosure, such information for his own purposes. Likewise, a lawyer should be diligent in his efforts to prevent the misuse of such information by his employees and associates. Care should be exercised by a lawyer to prevent the disclosure of the confidences and secrets of one client to another, and no employment should be accepted that might require such disclosure.

In addition, Canon 9 states: "A lawyer should avoid even the appearance of professional impropriety." This provision does not appear in the Rules; and the Code did not contain a conflict of interest section such as Rule 1.9. Both Canons are usually combined to deal with a conflict of interest question arising from subsequent representation of interests adverse to a former client.

Courts interpreted the Code in such a manner that the test for a conflict of interest is not substantially different from that embodied in Rule 1.9. Furthermore, the Third Circuit has followed other circuits in beginning to discredit Canon 9 as an exclusive basis for disqualification, reflecting a more liberal treatment of this question. *See In Re Corn Products Antitrust Litigation,* 748 F.2d at 162.

Resolving the question of whether to disqualify counsel cannot be accomplished through mechanical means, but requires a careful balancing of the goals and objectives of professional conduct. "The chosen mode of analysis is to carefully sift 'all the facts and circumstances'." *Pennwalt Corp. v. Plough, Inc.,* 85 F.R.D. 264, 269 (D.Del.1980); *Akerly v. Red Barn System, Inc.,* 551 F.2d 539, 543 (3d Cir.1977). The Third Circuit has long refused to adopt a per se rule in questions of disqualification. *Akerly,* 551 F.2d at 543.

■ There is no doubt that Nemours must be considered a former "client" of Bradley for the purpose of determining whether a conflict of interest exists. Bradley himself stated that he reviewed confi-

dential documents of Nemours when he represented Furlow in the litigation. Although there was no express attorney-client relationship, a fiduciary obligation, or "implied professional relation" existed nevertheless because Nemours disclosed information acting on the belief and expectation that such submission was made in order for Berg to render legal service to Nemours in furtherance of Nemours' interests. *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1319–20 (7th Cir.), *cert. denied*, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978).[7]

Regarding the second requirement, under the old Code the Third Circuit adopted the "substantial relationship" test, now formally incorporated into the Rules, in determining when an attorney is prohibited from accepting a subsequent representation. Disqualification of counsel is required "where it appears that the subject matter of a pending suit in which the attorney represents an interest adverse to a prior employer is such that during the course of the former representation the attorney 'might have acquired substantially related material.'" *American Roller Co. v. Budinger*, 513 F.2d 982, 984 (3d Cir.1975) (quoting in part *Richardson v. Hamilton Int'l Corp.*, 469 F.2d 1382, 1385 (3d Cir. 1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973)).

There is no doubt that the Pierce litigation in which the Biggs' firm is involved is substantially related to the matter in which Bradley was involved when he was representing Furlow; indeed, the matter is one and the same.

The third requirement of Rule 1.9 is also met: Pierce's interests are adverse to Nemours'. Finally, Nemours, the "former

client," now moving for disqualification of Biggs, certainly has not consented to the continued representation of Pierce. Bradley is thus clearly disqualified from representing Pierce in this litigation.

## B. *Disqualification of Biggs & Battaglia*

The next issue is whether the entire law firm of Biggs must be disqualified, given the disqualification of one of its associates. Pierce argues that an effective screening mechanism is an acceptable alternative to disqualification of an entire law firm when one of its associates formerly represented a client whose interests are "substantially related," and adverse, to those of a present client of the law firm.

An attorneys' disqualification is normally "imputed" to the other attorneys in his law firm. Sections (a) and (b) of Rule 1.10, which governs cases of imputed disqualification, state:

**RULE 1.10  Imputed Disqualification: General Rule**

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.2.

(b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which the lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) that is material to the matter.

---

**7.** There is no doubt that as far as Bradley's formal client, Furlow, was concerned, the confidences relayed to him from Furlow's co-party, Nemours, were "confidential" within this primary attorney-client relationship.

The relevant portion of Rule 1.6 which deals with confidentiality, reads: "(a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are im-

pliedly authorized in order to carry out the representation, and except as stated in paragraph (b)." The Comment to Rule 1.6 indicates the scope of confidential information. The confidential rule "applies not merely to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source." Such a source would certainly include a co-party such as Nemours.

Section b of Rule 1.10 incorporates the rules for disqualification for an individual attorney as spelled out in Rule 1.9 and applies them to the entire firm; and Section a also references Rule 1.9.

There is now an explicit exception to imputed disqualification. The Rules, unlike the Code, sanction the use of a screening mechanism in appropriate circumstances, specifically referring to former government attorneys. Rule 1.11 states: "A firm with which that lawyer is associated may undertake or continue representation in the matter only if the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom." Rule 1.11(b). The policy supporting this rule is to enable the government to attract qualified lawyers and to prevent the disqualification rule from imposing too severe a deterrent against entering public service. Comment to Rule 1.11.

The Comment to Rule 1.10 indicates the firm intention of its draftsmen that a pragmatic approach is necessary to the question of vicarious disqualification. The Comment also extends the analysis of Rule 1.10 to disqualified lawyers in law firms generally, not only former government attorneys. In the section "Lawyers Moving Between Firms," the authors of the Rules adopt a "functional analysis" in determining questions of vicarious disqualification. The rigid formalism underlying Canon 9's injunction against an "appearance of impropriety" is strongly rejected in favor of a new philosophy of pragmatism which balances the expectations of confidentiality of a former client against the importance of allowing a client the representation of his choice and promoting the mobility of attorneys, particularly associates, from one private law firm to another. The language of the Comment merits extensive quotation:

### Lawyers Moving Between Firms

When lawyers have been associated in a firm but then end their association, however, the problem is more complicated. The fiction that the law firm is the same as a single lawyer is no longer wholly realistic. There are several competing considerations. First, the client previously represented must be reasonably assured that the principle of loyalty to the client is not compromised. Second, the rule of disqualification should not be so broadly cast as to preclude other persons from having reasonable choice of legal counsel. Third, the rule of disqualification should not unreasonably hamper lawyers from forming new associations and taking on new clients after having left a previous association. In this connection, it should be recognized that today many lawyers practice in firms, that many to some degree limit their practice to one field or another, and that many move from one association to another several times in their careers. If the concept of imputed disqualification were defined with unqualified rigor, the result would be radical curtailment of the opportunity of lawyers to move from one practice setting to another and of the opportunity of clients to change counsel.

Reconciliation of these competing principles in the past has been attempted under two rubrics. One approach has been to seek per se rules of disqualification. For example, it has been held that a partner in a law firm is conclusively presumed to have access to all confidences concerning all clients of the firm. Under this analysis, if a lawyer has been a partner in one law firm and then becomes a partner in another law firm, there is a presumption that all confidences known by a partner in the first firm are known to all partners in the second firm. This presumption might properly be applied in some circumstances, especially where the client has been extensively represented, but may be unrealistic where the client was represented only for limited purposes. Furthermore, such a rigid rule exaggerates the difference between a partner and an associate in modern law firms.

The other rubric formerly used for dealing with vicarious disqualification is the appearance of impropriety proscribed in Canon 9 of the ABA Model Code of Professional Responsibility. This rubric

has a two-fold problem. First, the appearance of impropriety can be taken to include any new client-lawyer relationship that might make a former client feel anxious. If that meaning were adopted, disqualification would become little more than a question of subjective judgment by the former client. Second, since "impropriety" is undefined, the term "appearance of impropriety" is question-begging. It therefore has to be recognized that the problem of imputed disqualification cannot be properly resolved either by simple analogy to a lawyer practicing alone or by the very general concept of appearance of impropriety.

A rule based on a functional analysis is more appropriate for determining the question of vicarious disqualification. Two functions are involved: preserving confidentiality and avoiding positions adverse to a client.

The question of vicarious disqualification was raised but not decided in *United States v. Miller*, 624 F.2d 1198 (3d Cir. 1980). In *Miller*, the Government moved to disqualify a law firm representing the defendant because one of the firm's partners had been with the U.S. Attorney's office while the same case was being prepared against the defendant. Although not a member of the "Strike Force" preparing the case against the defendant, the attorney had discussed a legal question relevant to the case. *Id.* at 1199. The court, which affirmed both the disqualification of the attorney and his law firm, did not consider the use of a screening mechanism since the appellant had first raised it on appeal, and the district court had considered the issue on its own initiative and rejected it. Nevertheless, in his dictum, Judge Seitz did not in principle reject the use of a mechanism to screen a disqualified attorney when the proper circumstances were present. "We have nothing to tell us how a screening mechanism would operate in this case and whether it would be adequate to prevent an appearance of impropriety from arising." *Id.* at 1204.

*Miller* involved the case of a conflict of interest involving a former Government attorney. However, a district court in this Circuit has recently approved of a screening mechanism, and without the qualifying factor of former government service. In *INA Underwriters Insurance Co. v. Rubin*, 635 F.Supp. 1 (E.D.Pa.1983), the "Chinese Wall" defense was raised against a motion to disqualify a law firm. In that case, a client contacted a partner of the law firm Wolf, Block & Schorr ("Wolf, Block"). The client confided certain confidential information to the partner, but the partner subsequently refused to represent the client because he found that a conflict of interest existed. The court refused to apply an irrebuttable presumption that confidences were shared by the partners of Worlf, Block, and to impute the disqualification firm-wide. *Id.* at 3. There was no question that the partner who had met with the client was disqualified. The court approved of the screening of secret documents and firm members possessing knowledge of secrets and confidences in order to avoid disqualification of an entire firm. *Id* at 4. The partner had never discussed the substantive content of his meeting with the client with any of the attorneys inside or outside the Wolf, Block firm. *Id.* at 5. A refusal to disqualify Wolf, Block in this case would not only maintain public confidence and integrity of the legal system, but also promote the policies of respecting a litigant's right to retain counsel of its choice and of enabling attorneys to practice without excessive restrictions. *Id.* at 5–6.

Before the adoption of the Rules, case law in other circuits [8] and scholarly com-

---

**8.** *See Fred Weber, Inc. v. Shell Oil Co.,* 566 F.2d 602, 609 (8th Cir.1977), *cert. denied,* 436 U.S. 905, 98 S.Ct. 2235, 56 L.Ed.2d 403 (1978) (holding that every representation against a former client's co-defendant in a related matter raises an appearance of impropriety would unneces- sarily restrict choice of counsel available to litigants); *Woods v. Covington County Bank,* 537 F.2d 804, 813 n. 12 (5th Cir.1976) (test is whether likelihood of public suspicion or obloquy outweighs social interests served by lawyer's continued participation in a particular case);

mentary[9] had already adopted a liberalized approach based on a functional analysis. In the Second Circuit, where this approach has received its most extensive development, the test is whether the conduct of the disqualified attorney taints the underlying trial. *Armstrong v. McAlpin*, 625 F.2d 433, 444 (2d Cir.1980) (en banc), *vacated on other grounds and remanded*, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981). Disqualification if based solely on the appearance of impropriety cannot be justified as long as a firm's representation does not pose a threat to the integrity of the trial process. *Id.* As the court in *McAlpin* stated:

> We recognize that a rule that concentrates on the threat of taint fails to correct all possible ethical conflicts.... However, absent a threat of taint to the trial, we continue to believe that possible ethical conflicts surfacing during a litigation are generally better addressed by the "comprehensive disciplinary machinery" of the state and federal bar [citation omitted] or possibly by legislation.

*Id.* at 445–46; *Board of Education of New York City v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir.1979). A court should only reluctantly order disqualification because of the immediate adverse effect on the client of separating him from counsel of his choice. *Nyquist*, 590 F.2d at 1246. Such motions for disqualification are often made for tactical reasons, and even when made in the best of faith, inevitably cause delay.

Several circuits have extended this functional analysis to create a rebuttable presumption of shared confidences among attorneys in a law firm in order to avoid vicarious disqualification. *See Ez Paintr Corp. v. Padco, Inc.*, 746 F.2d 1459, 1462 (Fed.Cir.1984) (applying law of Eighth Cir.);

*Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1267–68 (7th Cir.1983); *LaSalle Nat'l Bank v. County of Lake*, 703 F.2d 252, 258–59 (7th Cir.1983); *Sierra Vista Hosp., Inc. v. United States*, 639 F.2d 749, 753, 226 Ct.Cl. 223 (1981); *Cheng v. GAF Corp.*, 631 F.2d 1052, 1057–58 (2d Cir.1980), *vacated on other grounds and remanded*, 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981) (rejecting "Chinese Wall" defense only on facts of particular case); *Kesselhaut v. United States*, 555 F.2d 791, 793, 214 Ct.Cl. 124 (1977).

The factual circumstances of *Lemaire v. Texaco, Inc.*, 496 F.Supp. 1308 (E.D.Tex. 1980), closely resemble those of the case at bar. In that case, an attorney switched law firms after having represented one party in a lawsuit to the limited extent of filing initial pleadings. His new law firm represented the opposite side in the *same* litigation. The screening was established immediately, even before the attorney accepted the position with the new firm. The attorney went to great lengths to insure that he would have no connection with any facet of the lawsuit. He also made certain he would receive no part of any attorneys' fees collected in the case or share in its expenses.[10] The lawsuit was complex and very expensive to prepare. There was no other law firm in the area qualified or willing to take on the litigation. *Id.* at 1309. The court found that any appearance of impropriety was greatly outweighed by the plaintiffs' right to have counsel of their choice. *Id.* at 1310.

There is no substantial reason against extending the exception to vicarious disqualification from the case of a former government attorney to private attorneys generally although the complex of policy

*Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 518 F.2d 751, 757 (2d Cir.1975) (underscoring importance of public's right to counsel of its choice and economic mobility).

**9.** *See* Liebman, *The Changing Law of Disqualification: The Role of Presumption and Policy,* 73 Nw.U.L.Rev. 996 (1979); Lindgren, *Toward a New Standard of Attorney Disqualification,* 1982 A.B.A. Found. Research J. 419 (1982); Com-

ment, *The Ethics of Moving to Disqualify Opposing Counsel for Conflict of Interest,* 1979 Duke L.J. 1310 (1979); Note, *The Chinese Wall Defense to Law-Firm Disqualification,* 128 U.Pa.L. Rev. 677 (1980); Note, *A Dilemma in Professional Responsibility: The Subsequent Representation Problem,* 50 UMKC L.Rev. 165 (1982).

**10.** *See* Rule 1.11(b).

factors differs somewhat in the two situations:

> Once it is admitted that a Chinese Wall can rebut the presumption of imputed knowledge in former government attorney cases, it becomes difficult to insist that the presumption is irrebutable when the disqualified attorney's previous employment was private and not public. To hold fast to such a proposition would logically require a belief that privately employed attorneys are inherently incapable of being effectively screened, as though they were less trustworthy or more voluble than their ex-Government counterparts. If former government attorneys can be screened effectively, it follows that former private attorneys can to.

*INA Underwriters Insurance Co. v. Rubin*, 635 F.Supp. at 5 (quoting Note, *The Chinese Wall Defense To Law-Firm Disqualification*, 128 U.Pa.L.Rev. 677, 701 (1980)).

■ The Court holds that an appropriate screening mechanism, in the proper circumstances, may rebut the presumption of shared confidences that arises under Rule 1.10 in cases where the disqualified attorney's conflict of interest originated in private practice. The Court prefers to refer to this screening procedure figuratively as a "cone of silence"[11] rather than a "Chinese Wall." The conical image, a metaphor adopted from popular television, more appropriately describes the responsibility of the *individual* attorney to guard the secrets of his former client. He is commanded by the ethical rules to seal, or encase, these particular confidences within his own conscience. The term "Chinese Wall" is suggestive of attempts in the context of a large law firm to physically cordon off attorneys possessing information from the other members of the firm who represent clients whose interests are adverse to interests of these attorneys' former clients. *See Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1269 (7th Cir.1983). Such an approach tends to cast a shadow of disrepute on attorneys separated in this manner from their professional colleagues. The implicit assumption is that the wall, if high and thick enough, will resist an errant attorney's lack of discretion, and calm public mistrust through prophylaxis. A firm of more moderate size must therefore erect a wall of greater impenetrability. Instead, the Court believes that the more logically consistent, honest, and straightforward approach is to credit members of the legal profession with a certain level of integrity. This emphasis on the ethical rules themselves, rather than a presumption that they will be circumvented, should more effectively promote public respect for the bar. In effect, the Rules enjoin the attorney to guard his client's secrets in an affirmative and deliberate manner, through self-imposed silence. Canon 4 and Rule 1.6, which mandate maintenance of a client's confidences, have an independent significance. *Baglini v. Pullman*, 412 F.Supp. 1060, 1064 n. 11 (E.D.Pa.), *aff'd*, 547 F.2d 1158 (3d Cir. 1976). Moreover, the trend among courts now to rule out an "appearance of impropriety" as the sole basis for disqualification strongly supports this increased emphasis on the ethical rule of confidentiality. *McAlpin*, 625 F.2d at 444; *Silver Chrysler Plymouth*, 518 F.2d at 757.

■ On the other hand, certain objective circumstances, including the timing and physical characteristics of the screening, will in many cases require disqualification of an entire firm. The evidence of faithfulness to Rule 1.6 is only one factor in a balancing of the policy factors identified above against the likelihood that confidences will be violated. The size of the firm remains an important consideration, as well as the nature of the prior involvement of the tainted attorney and the extensiveness of the screening. The test is one that integrates subjective reliance on the Rules, manifested by the attorney's "cone of si-

---

**11.** As explained at greater length later in this opinion, in this case, Bradley determined on his own initiative not to speak to anyone concerning the Furlow-Nemours representation. This self-imposed silence began immediately upon his gaining knowledge of the adverse representation at Biggs.

lence," with objective evidence that the Rules are being followed.

■ As in *Rubin* and *Lemaire*, Biggs' and Bradley's deliberateness and speed in establishing a "cone of silence" in the instant case similarly help support denial of the motion to disquaify. The circumstances of this case strongly support such a finding. Bradley himself is required by Rule 1.6 to maintain the confidences of his former client. The Court harbors no doubt based on the present affidavits that he thus far has not violated this ethical norm. If he should disclose any information, although. he claims that he has no recollection of any substantive confidences, he can be subject to the disciplinary machinery of the state bar. *McAlpin*, 625 F.2d at 446. The Court's primary task at this juncture is to ensure a fair and just trial. *Id.* at 445–46; *Nyquist*, 590 F.2d at 1246. Following Rule 1.6, Bradley immediately sealed himself in a "cone of silence," resolving not to say anything concerning the substance of any communication, documents, or information to which he may have had access. (D.I. 728, ¶¶ 19–20.) In addition, Bradley's present lack of access to the information helps to reinforce his fidelity to Rule 1.6. When he changed firms, Bradley did not personally retain any notes or documents with which to refresh his recollection. (*Id.* at ¶ 6.) Furthermore, the information he reviewed when he was with the Berg firm was primarily non-confidential and his memory of this information is now fading. (*Id.* at ¶¶ 9, 11, 12, 25.) The importance of the ethical precept against disclosure of client confidences as a prophylactic safeguard in instances where violation of confidences is possible was recognized by the district court in *Baglini v. Pullman*, 412 F.Supp. at 1064 n. 11. *See Silver Chrysler Plymouth, Inc. Chrysler Motors Corp.*, 518 F.2d 751, 757 (2d Cir.1975) (Canon 9 should not override delicate balance created by Canon 4).

Supplementing Bradley's own self-imposed silence, Biggs has established an effective screening mechanism which has been in place ever since Bradley's former involvement was discovered. No information was disclosed to other Biggs attorneys up to that time or since then. Bradley does not know where the Pierce files are located at Biggs. These files are not contained in Biggs' central filing system but are segregated in separate file cabinets, all adjacent to one partner's office. Only pleadings and correspondence are located in Biggs' offices. (D.I. 726, ¶¶ 7–9; D.I. 727, ¶¶ 5–8; D.I. 728, ¶ 24.) Although Biggs would be considered a medium-size firm by Wilmington standards, the limited nature of Bradley's contact with his "former client" and knowledge of the litigation effectively counterbalance this factor.[12]

Another factor indicating that the confidences and secrets of Nemours will remain inviolate is the extent of Bradley's previous involvement in the litigation. Bradley was not the lead counsel in this litigation when he was at Berg. (D.I. 728, ¶¶ 4, 13.) He had only recently joined Berg after becoming a member of the Delaware Bar,[13] and was assigned the duties which typically characterize the life of a young associate in his position. In addition, his involvement was brief, lasting only about four months, and ended approximately eight months before he changed firms. The attorney's degree of prior involvement, whether he controlled strategy, whether he was an associate or partner, and whether he shared legal fees from his firm's representation are all important factors in evaluating the effectiveness of a "cone."[14]

Furthermore, the policies identified in the Comment to Rule 1.10 would be promoted by a decision denying disqualification in this case. As of October 1985, in

---

**12.** As reported by the law firms themselves, as of March 1986, Biggs & Battaglia had 16 attorneys; Richards, Layton· & Finger and Morris, Nichols, Arsht & Tunnell, two of Wilmington's largest law firms, had 52 and 43 attorneys, respectively, in Wilmington.

**13.** Bradley became a member of the Delaware Bar in 1983, having graduated from law school in 1981. 1 Martindale-Hubbell Law Directory 3408B (1985).

**14.** As an associate, Bradley would receive only his fixed, annual salary.

the entire State of Delaware there were currently 856 attorneys in private practice, 710 of whom practice in New Castle County.[15] Of the 710 attorneys, over 280, or over forty percent, work for only ten Wilmington law firms.[16] Eleven different law firms have been involved directly in this case and eight of these are in the "top ten."[17] Attorney mobility, especially among young associates, would be severely restricted if a per se rule against a "cone of silence" were adopted. The small number of private firms in Wilmington of substantial size, combined with the facts and circumstances of this case, cry out for a flexible approach to vicarious disqualification.

In addition, Pierce would be considerably prejudiced by the disqualification of Biggs at this point in the litigation, shortly before trial is scheduled to begin on March 31, 1986. When Pierce attempted to obtain local counsel in Wilmington, all the major law firms in Wilmington either were already representing parties or believed that a conflict existed. (D.I. 729, ¶¶ 10–11.)[18] Jack Rephan, attorney for Braude, Margulies, stated that he was not aware of any other office in Delaware of "sufficient abilities or facilities equipped to represent Pierce" in this litigation other than Biggs, after the other firms were found to have a conflict of interest. This large, complex litigation requires a large law office locally located with sufficient facilities and manpower to adequately represent Pierce's interests. (*Id.* at 12–13.) The Court has scheduled three full months for the trial. Moreover, an "excellent working relationship" has developed between Pierce and its local counsel. (*Id.* at 14.) An abrupt withdrawal by Biggs would substantially prejudice Pierce in this litigation.[19]

In contrast, Nemours fails to adduce any convincing evidence of prejudice to its interests resulting from Biggs' continued representation of Pierce. Nowhere in presenting its argument does Nemours allege the slightest disadvantage or harm. Certainly, the fact that Nemours was only a co-party of Bradley's primary client has some significance. Furthermore, this is not the case of a partner who, as a major strategist, must be quarantined from contact with other members of his firm who are involved in a case from which he is disqualified. This representation of Pierce by Biggs therefore has no tendency to "taint the underlying trial." *McAlpin*, 625 at 444; *Nyquist*, 590 at 1246. This fact, in combination with the harm that would accrue to Pierce should Biggs be required to withdraw, and the other powerful arguments of policy, all support denial of Nemours' motion to disqualify.

In addendum, the Court takes note of a factor weighing against Nemours' motion

---

**15.** Certificate of Andrew T. Horsey, Clerk of the Supreme Court of the State of Delaware, October 31, 1985. (D.I. 725.)

**16.** 1 Martindale-Hubbell Law Directory 3151B–3183B (1985).

**17.** According to Pierce, among the law firms that have been involved in the consolidated and related actions are: Richards, Layton & Finger; Young, Conaway, Stargatt & Taylor; Prickett, Jones, Elliott, Kristol & Schnee; Morris, Nichols, Arsht & Tunnell; Morris, James, Hitchens & Williams; Connolly, Bove, Lodge & Hutz; Skadden, Arps, Slate, Meagher & Flom; Biggs & Battaglia; Ashby, McKelvie & Geddes; Howard M. Berg & Associates, P.A.; and O'Donnell & Hughes. Potter, Anderson & Corroon also claimed a conflict since they previously had represented a party. (D.I. 729, ¶ 11.)

**18.** Although the Court accepts Pierce's claim that it would be harmed by disqualification, it should be noted that in many cases local Wilmington counsel often serve as an interpreter of local rules of civil procedure and as a resource for trial preparation for out-of-town counsel. Nevertheless, such counsel are an integral part of a litigation team on a large and complicated case such as this.

**19.** Indeed, if Biggs & Battaglia were to be disqualified in the circumstances of this case, it is quite possible that in view of the realignment of the parties which resulted in the disqualification of Bradley, other firms should be disqualified, including counsel for the moving party on this motion.

Gilbane and Pierce were originally aligned together and shared confidential information. (D.I. 729, ¶ 9.) Through settlement, Gilbane is now aligned with Nemours. The technical disqualifications resulting from this realignment would rapidly cause this litigation to become unmanageable.

involving possible delay. Courts have been extremely reluctant to disqualify attorneys when there is a possibility that a motion was made primarily for strategic purposes in a litigation. Even when made in the best of faith, such motions inevitably cause delay. *McAlpin* at 444. It is possible—but by no means proven—that counsel for Nemours knew already in April 1985 that Bradley had joined Biggs.[20] Nemours raised this issue five months later, in September. Shortly before that, Nemours had lost a motion to compel. The total absence of any prejudice to Nemours of Bradley's association with Biggs—other than the expected zealous and energetic advocacy of Pierce's interests by its counsel—tends to strengthen the appearance of mere delay and harassment as the overriding motive for the plaintiff's motion to disqualify. Nevertheless, the evidence is not sufficient to show that delay was an intentional element. The other factors standing alone are sufficient to withstand a motion to disqualify.

Judgment will be entered in accordance with this Opinion.

20. In April 1985, notices were sent to all members of the Delaware Bar that Bradley had joined the Biggs firm. (D.I. 726, ¶ 17.)