OPINION OF THE COURT
Erik S. Pitchal, J.
Now pending before the court is the respondent Jacquelin G.’s motion to disqualify the Legal Aid Society (LAS) from representing the subject child in this child protective proceeding. For the reasons that follow, the motion is denied.
Procedural Background
This case has a complicated procedural history, of which only a portion is relevant to the instant motion. On or about April 25, 2012, the Administration for Children’s Services (ACS) filed *933 a petition pursuant to article 10 of the Family Court Act alleging that the respondents, Jacquelin G. and Randolph W, neglected their daughter Jalicia, who was then approximately 17 months old. Jalicia was assigned an attorney from the Bronx office of the LAS Juvenile Rights Practice, Patricia Nevergold; Mr. W was assigned an attorney from the Family Court practice of the Bronx Defenders, Erin Miles; and Ms. G. was assigned an attorney from the Bronx Family Court 18-B panel, Edward Arfe.
The case was initially heard by Honorable Kelly O’Neill-Levy, before whom a fact-finding hearing commenced on or about July 23, 2012. In the middle of the trial, Mr. Arfe requested to be relieved, due to an irreparable breakdown in communication between himself and his client. Judge O’Neill-Levy granted this request, declared a mistrial as to Ms. G., and assigned Aleza Ross as Ms. G.’s new attorney. Judge O’Neill-Levy completed the fact-finding as to Mr. W in January 2013.[1]
On or about January 23, 2013, Ms. G.’s case was transferred to this court. Fact-finding recommenced on May 10, 2013, and a permanency hearing was held the same day. On May 10 Ms. G. also requested the immediate return of the child. As there is no statutory provision or case law restricting the right of a respondent to request a section 1028 hearing prior to the completion of fact-finding even though a fact-finding has already commenced, the court agreed to conduct a section 1028 hearing. The section 1028 hearing began on May 17 and was continued to May 21. On May 21 Ms. G. testified on her own behalf, and by way of background noted that she herself had been in foster care from the age of 12 to the age of 21. (She gave birth to Jalicia when she was 23 and was 24 when this case commenced.)
As the court is aware that most foster children in New York City are represented by LAS, the court was concerned that LAS might have represented Ms. G. when she was in ACS custody and that, if so, it might be a conflict of interest for LAS to represent her daughter now. Ms. G. reported that before she was placed in foster care, she had lived with her family in Queens. Thus, the court halted the section 1028 hearing and while on the record queried the UCMS database for Queens Family Court. The court learned that Ms. G. had indeed been the subject child of an article 10 proceeding in that court, during which time she was represented by Nadia Seerantan, who, it *934 was later ascertained, had been a staff attorney in the Queens office of the LAS Juvenile Rights Practice at the time. Ms. Ross reported that when she took over the case from Mr. Arfe, she was not made aware of the fact that her client had previously been represented by LAS. Ms. Nevergold stated that when she was assigned Jalicia’s case on or about April 25, 2012, she was not aware that Ms. G. had been in foster care, let alone had been represented previously by LAS; indeed, she was told by her office that there was “no conflict” and she could pick up the case.
This motion to disqualify LAS followed. The order to show cause was heard on June 6, at which time LAS requested additional time to respond in writing. That request was granted, and a briefing schedule was set.[2] LAS, appearing by Ms. Never-gold’s supervisor Dawne Mitchell, filed its opposition papers on or about June 13; Ms. Ross filed a reply on or about June 17; and a further hearing on the motion was conducted on June 18. ACS did not file papers and indicated it supports LAS in this motion. Respondent W. did not participate in the motion. The court reserved decision.[3]
Factual Findings
The following facts relevant to the motion are undisputed. The salient facts were elicited via the papers and colloquy with counsel at motion hearings on June 6 and 18; because they are not in dispute (see June 18, 2013 tr at 13-14), no evidentiary hearing was conducted. Ms. G. was in foster care from the age of 12 to 21, from November 1999 until July 2008, pursuant to an article 10 case in Queens Family Court. During that time period, she was assigned an attorney from the LAS Queens Juvenile Rights Practice, who represented her in the Family Court proceedings. There were three LAS staff attorneys assigned to her case during this period: Renee Mitler, Nadia Seerantan, and Tara Famular. Ms. Mitler now works in the LAS Manhattan of *935 fice, and Ms. Famular remains in Queens, but Ms. Seerantan is no longer employed by LAS. The LAS representation of Ms. G. in Queens ceased on or about May 19, 2008. Ms. G. does not recall ever having an attorney as part of her foster care case.
Approximately one month after it closed its Queens case for Ms. G. in 2008, LAS sent its hard file for the case to its archival service. In order for LAS staff in one borough office to obtain archived files that originated in another borough, the originating borough supervisor would have to be notified and agree to the request. No such request has ever been made by the Bronx office for the Queens office’s file on Ms. G.
The LAS case management database contains client pedigree data and information about case outcomes, but it does not contain substantive information such as notes from client meetings, correspondence, or investigation or discovery material. Going forward, LAS hopes to use more electronic records, but for historical records even as recent as 2008, confidential client information is contained only in the hard files and the personal memories of individual staff. Moreover, once a case is closed and the hard file is archived, the case management system is coded to prohibit access by staff attorneys to the associated electronic record.
On or about April 25, 2012, ACS filed a child protective case in Bronx Family Court alleging that Ms. G. neglected her own daughter, 17-month-old Jalicia. Pursuant to its protocol for conflict checks, non-attorney staff from LAS queried its case management database to determine if it had any conflicts that would prohibit it from representing Jalicia. Upon reviewing the results, an attorney supervisor determined that there was “no conflict,” and Patricia Nevergold, a staff attorney, was instructed that she could represent the baby and was not told that LAS previously represented Ms. G. She has been the assigned LAS attorney ever since. Not being aware that LAS previously represented Ms. G., she has not sought out any prior files or information contained within the LAS archives or electronic records. She has not had any conversations with Ms. Mitler or Ms. Famular about this case, nor has Ms. Nevergold’s supervisor, Ms. Mitchell.
In the Bronx litigation, Ms. Nevergold has been advocating a position adverse to Ms. G., both by opposing the child being returned to Ms. G.’s custody and by supporting a finding of neglect against her. No written informed consent for LAS to represent her daughter was sought or obtained from Ms. G.
*936 Legal Analysis
The Duty of Loyalty and Imputed Conflicts
Ordinarily, the Rules of Professional Conduct prohibit a lawyer from representing a party with materially adverse interests to that of a former client in the same matter or in a substantially related matter, absent a written waiver. (Rules of Professional Conduct [22 NYCRR 1200.0] rule 1.9; Cardinale v Golinello, 43 NY2d 288 [1977].) Also, the conflicts of an individual attorney are generally imputed to her entire firm. (Rules of Professional Conduct [22 NYCRR 1200.0] rule 1.10; Cardinale at 295.)
An animating purpose driving the duty of loyalty is the continuing duty of confidentiality that an attorney owes to a former client. (Rules of Professional Conduct [22 NYCRR 1200.0] rule 1.6; Kassis v Teacher’s Ins. & Annuity Assn., 93 NY2d 611, 615-616 [1999]; Cardinale at 295-296; NY St Bar Assn Comm on Prof Ethics Op 605 [1989].) A former client may be justifiably concerned about the continuing sanctity of her confidences if her former attorney later represents someone else against her. (Solow v Grace & Co., 83 NY2d 303, 309 [1994].)
In Ms. G.’s case, attorneys from LAS previously represented her when she was in foster care, advocating for her wishes and needs. {See Family Ct Act § 241.) In the present case, Ms. Nevergold, on behalf of Jalicia, is advocating a position contrary to Ms. G.’s, as she vigorously opposed Ms. G.’s section 1028 application and supports the petitioner’s case for neglect. Thus, because an attorney associated with the same law firm that employed attorneys who previously represented her is now taking a position that is materially adverse to her, the general rule requiring attorneys to be loyal to former clients is implicated here. So too is the rule imputing the conflicts of an individual attorney to her firm.
Substantially Related Matters
Of course, the duty of loyalty to former clients is only applicable if the new matter is “substantially related” to the prior representation. Here, LAS argues that the current case in the Bronx in which Ms. G. is a respondent is “distinct” from the case in Queens four to five years ago in which she was a foster child. (Mitchell affirmation 1112.) Ms. G.’s counsel asserts that the matters are substantially related because there is a substantial risk that confidential information LAS obtained about her in the Queens case could be used against her in the current litigation. (Ross reply affirmation 1i 6.)
*937 There are two ways that a current matter may be deemed “substantially related” to a prior matter for the purpose of rule 1.9 analysis. First, if the issues in the two cases are identical to each other, or essentially the same, then the matters are said to be substantially related. Alternatively, if the information generated in the first matter is substantially related to a material issue in the subsequent matter, then the cases are deemed substantially related. Put another way, if in the prior matter the attorney received specific confidential information that is substantially related to the present litigation, or if there is even a reasonable probability that the attorney received such information, then rule 1.9 is implicated. (Lightning Park v Wise Lerman & Katz, 197 AD2d 52, 55-56 [1st Dept 1994]; First Hudson Fin. Group, Inc. v Martinos, 11 Misc 3d 394, 397-398 [Sup Ct, NY County 2005].) After all, the duty of loyalty to former clients is mandated as a buttress to ensure the continued duty of maintaining former clients’ confidences. Even if the causes of action in the two matters are distinct, and even if the specific factual allegations pleaded in the two cases have nothing to do with each other, if confidential information from the first case is relevant in the second case, then the two cases are substantially related. {Cf. NY St Bar Assn Comm on Prof Ethics Op 628 [1992].)
In the course of zealously advocating for her needs as a foster child, there is a reasonable probability that Ms. G.’s LAS attorneys obtained confidential information about her at that time that would be relevant to issues in the current litigation. For example, if she had any behavioral issues or emotional disturbances (as is common among teenagers in foster care), her attorneys would have been privy to this. It is reasonable to think that her LAS attorneys would have consulted with in-house social work staff and/or Ms. G.’s therapist at the time, gaining confidential information about the extent of her condition, any diagnoses and prognoses, and recommended treatments. Likewise, if in the course of their regular interactions with the teenage Ms. G. her LAS attorneys were concerned about her cognitive development, this would also be considered confidential information gained in the course of confidential attorney-client conversations. Any advice rendered by LAS social work staff regarding Ms. G.’s cognitive issues would also have to be considered as falling under the umbrella of client confidences.
The court agrees with Ms. G. that the current child protective case against her is substantially related to the prior case in *938 which she was the subject child. The initial question presented in the Bronx litigation was whether then-24-year-old Ms. G. neglected her daughter by engaging in domestic violence with the child’s father in the child’s presence. While Ms. G.’s mental health and cognitive abilities would not appear to be relevant to that question, article 10 litigation is rarely limited to the explicit allegations presented in the initial petition. Indeed, in addition to the fact-finding hearing conducted on the petition itself, when the court conducts a hearing pursuant to Family Court Act § 1028, the operative question is whether the child would be at imminent risk to be returned to her mother’s care; this can be an inquiry that goes beyond the allegations in the petition. Additionally, should the court make a finding of neglect, the court will then be required to enter a dispositional order, which will be determined by reference to the child’s best interests. (See Family Ct Act § 1052.) The question of what disposition is in the child’s best interests is deeply entwined with a determination of the parent’s strengths and weaknesses, and the parent’s history of emotional problems, if any, is generally explored when this issue is litigated.
Ms. G.’s mental health and cognitive abilities are thus material issues in the present Bronx case. In fact, ACS has provided notice that it intends to ask the court to conform the pleadings to the proof adduced at fact-finding, and some of the evidence in the fact-finding hearing has touched on Ms. G.’s mental health. Her mental health and cognitive abilities were also a primary focus of the section 1028 hearing and the court’s ruling on that hearing. (See decision on application for return of child pursuant to Family Ct Act § 1028, July 8, 2013 at 3-6.) They will undoubtedly be major issues at any dispositional hearing the court would be required to conduct, as well. Because there is a reasonable probability that LAS attorneys received confidential information relevant to these issues during their prior representation of Ms. G., the court finds that the prior case and the current one are substantially related, within the meaning of rule 1.9. For that reason, at a minimum, Renee Mitler, Tara Famular, and Nadia Seerantan must be disqualified from having anything to do with Jalicia’s representation.[4]
Overcoming the Presumption of Disqualification
Notwithstanding that an attorney from LAS is currently advocating a position against Ms. G. while assigned to represent *939 her child in a matter substantially related to a case in which other LAS attorneys previously represented Ms. G., the law does not necessarily require the court to disqualify LAS. While the individual attorneys from LAS who previously represented Ms. G. in Queens are themselves disqualified, as they do owe her a continued duty of loyalty under rule 1.9, rules 1.9 and 1.10 do not establish a mandatory or irrebuttable presumption of disqualification of their entire law firm in circumstances like this one. (Kassis, 93 NY2d at 616-617; Solow, 83 NY2d at 309.)
The law teaches that an inflexible rule in this area would unfairly disqualify members of the firm who themselves have no knowledge of the client’s confidences or secrets. An inflexible rule would also incentivize motions to disqualify mid-trial as a delay tactic. As “disqualification of a law firm during litigation may have significant adverse consequences to the client and others, ‘it is particularly important that the Code of Professional Responsibility not be mechanically applied when disqualification is raised in litigation.’ ” (Kassis, 93 NY2d at 617-618, quoting S & S Hotel Ventures Ltd. Partnership v 777 S. H. Corp., 69 NY2d 437, 444 [1987].) Instead of mechanically applying the rules to dismiss an attorney, “any fair rule of disqualification should consider the circumstances of the prior representation.” (Solow at 313; see also Silver Chrysler Plymouth, Inc. v Chrysler Motors Corp., 518 F2d 751 [2d Cir 1975].) The ethical rules provide guidance, and they are the body of law on which bar authorities base disciplinary decisions, but they are not mandates on how courts should handle live litigation. (S & S Hotel Ventures, 69 NY2d at 444-445; Rules of Professional Conduct [22 NYCRR 1200.0] Preamble [12].)
To disqualify the entire Legal Aid Society from representing her daughter on the basis of rules 1.9 and 1.10, Ms. G. needs to make a showing of a risk that the LAS personnel working on her daughter’s behalf in the current case have acquired or could acquire the confidences and secrets she shared with other LAS personnel when she was represented by LAS previously. (Kassis, 93 NY2d at 617; see also Nimkoff v Nimkoff, 18 AD3d 344, 345-346 [1st Dept 2005].) If she makes such a showing, the burden shifts to LAS to disprove that the current attorney had any opportunity to acquire confidential information from LAS’s files or through contact with the attorneys who represented Ms. G. previously. (Kassis at 617.)
Based on the undisputed facts, the court finds that there is no risk that the current attorney assigned to represent Ms. G.’s *940 child, Ms. Patricia Nevergold, has obtained confidential information learned by LAS from its prior representation of Ms. G. One of the staff attorneys who represented Ms. G. in the Queens matter left Legal Aid’s employment before the current case in the Bronx was filed, another now practices in the Manhattan LAS office, and the third remains in Queens. Legal Aid attorneys in one county rarely interact with their colleagues in other counties, and have no cause to ever discuss their cases with each other. The hard file from Ms. G.’s Queens case was sent to archives when it was closed approximately five years ago, and Ms. Nevergold never asked for it to be retrieved and provided to her, nor could she, without supervisory approval in both the Bronx and Queens offices. The Juvenile Rights Practice’s computer system does not contain substantive information about cases as old as Ms. G.’s Queens case, so there is no possibility that Ms. Nevergold could have queried the system to retrieve confidential information about Ms. G.[5] 6 (Compare Cardinale, 43 NY2d at 292 [affirming disqualification of small firm characterized by crosscurrent of discussion and ideas among all attorneys on all matters, and all firm files were open and available to all lawyers].)
Indeed, the central issue in determining whether the “circumstances of the prior representation” (Solow at 313) warrant disqualification of an entire law firm is whether there was a free flow of information among its attorneys such that there is a meaningful risk that confidences shared with the prior attorney would be available to the current attorney taking an adverse position to the former client. (People v Wilkins, 28 NY2d 53, 56 [1971]; Matter of Hurlburt v Behr, 70 AD3d 1266 [3d Dept 2010].) It is simply not realistic to treat large firms, where information does not readily flow among frontline staff with their own individual case loads, the same as small firms. (Denise A. Copeland, Conflicts of Interest in the Mega-Firm, 13 J Legal Prof 255 [1988].) Courts considering whether there is a free flow of confidential case information within LAS have generally concluded that there is not. (See e.g. Wilkins, 28 NY2d at 53; People v Chambers, 133 Misc 2d 868 [Sup Ct, Kings County 1986]; People v Spencer, 101 Misc 2d 259 [Sup Ct, Kings County 1979].) These cases support this court’s conclusion that there is *941 no risk that Ms. Nevergold has access to confidential information Ms. G. shared with other LAS staff.
Once the presumption of disqualification is rebutted, the attorney may generally remain on the case so long as reasonable steps are taken to ensure that, going forward, there is no sharing of confidences from her firm’s past representation of the former client, generally by isolating the attorney who possesses the confidences from the current matter. (Nimkoff., 18 AD3d at 346; Rules of Professional Conduct [22 NYCRR 1200.0] rule 1.0 [t].) As provided in the Comments to rule 1.0:
“The purpose of screening is to ensure that confidential information known by the personally disqualified lawyer remains protected. The personally disqualified lawyer should acknowledge the obligation not to communicate with any of the other lawyers in the firm with respect to the matter. Similarly, other lawyers in the firm who are working on the matter should promptly be informed that the screening is in place and that they may not communicate with the personally disqualified lawyer with respect to the matter. Additional screening measures that are appropriate for the particular matter will depend on the circumstances. In any event, procedures should be adequate to protect confidential information.” (Rule 1.0 Comment [9].)
In Ms. G.’s case, there were three LAS attorneys who represented her during her time in foster care, only two of whom are still employed by LAS, Renee Mitler and Tara Famular. (Mitchell affirmation II10.) These two lawyers are disqualified from representing Ms. G.’s child in the current litigation, and they must be screened out from anything to do with the present matter. (See Matter of Susan K. v Thomas C., 25 Misc 3d 1207[A], 2009 NY Slip Op 51995DJ] [Fam Ct, Monroe County 2009].) LAS has given assurances that they have been. (Mitchell affirmation 1110.) Placing them within a “cone of silence” (Nemours Found. v Gilbane, Aetna, Fed. Ins. Co., 632 F Supp 418, 428 [D Del 1986]), combined with a directive that Ms. Nevergold not seek out any confidential information about Ms. G. from them or their files (Spencer, 101 Misc 2d at 262), is sufficient to protect Ms. G.’s confidences while permitting LAS to remain on the current case.
Based on the same facts that establish that there is no risk that Ms. Nevergold had access to confidential information about Ms. G. that may be in the LAS files at the time this motion was *942 filed, there is also no risk that, going forward, Ms. Nevergold will obtain such information. As an officer of the court she has represented that she will not seek it out.
Appearance of Impropriety
The Rules of Professional Conduct are concerned not only with actual improprieties but also with the appearance of impropriety. (See generally Cardinale, 43 NY2d at 296.) For that reason, it is essential that large law firms have written policies and protocols to screen for potential conflicts of interest between potential clients and former clients at the outset of new representation. Such policies can identify irremediable conflicts before they arise, leading to the declining of representation. Equally important, these policies can create screens or cones of silence around specified personnel within the firm to permit the firm to take on new matters even if mechanical application of rules 1.9 and 1.10 might suggest disqualification is necessary. The LAS Juvenile Rights Practice has such protocols and its attorneys have represented to the court that they were applied in this case. There is no evidence to suggest otherwise.
The gravamen of Ms. G.’s motion is that LAS’s actions create an appearance of impropriety. Her attorney argues that analysis of whether there is an appearance of impropriety should occur from the subjective point of view of the client, as opposed to the general public. (Ross reply affirmation 1f 18.) Among other deficits to this argument is the fact that her motion contains no affidavit from Ms. G. herself attesting to her views of the situation and any purported feelings of betrayal. Nevertheless, the court will give Ms. G. the benefit of the doubt and accept as true the representations made by her lawyer concerning her views.
However, there is no reason to suggest that Ms. G.’s personal views of the propriety or lack thereof of LAS’s actions matter to the outcome of her motion. Counsel provides no citation for the proposition that the appearance analysis ought to be a subjective, as opposed to an objective, assessment of how the lay public would view the situation. While there may be areas of the law in which courts look to the characteristics of a specific sub-population when making “reasonable person” determinations (see e.g. J. D. B. v North Carolina, 564 US —, 131 S Ct 2394 [2011] [holding that determination of whether child was in custody for purposes of triggering Miranda rights should be viewed with reference to how a reasonable juvenile would experience the situation]), counsel does not argue that the court *943 should analyze the appearance of impropriety issue from the perspective of respondent mothers in article 10 cases or any other particular group. Rather, she posits that Ms. G. is “a young mother who spent the bulk of her childhood in foster care” and has “feelings of mistrust of the system and injustice,” and that the appearance issue “should be viewed in the light of the client.” (Ross reply affirmation 1Í1Í18-19.)
One of the philosophical underpinnings of the Rules of Professional Conduct is that by adhering to the rules and self-regulating, the legal profession earns and maintains public confidence. (See Rules of Professional Conduct [22 NYCRR 1200.0] Preamble [1], [4], [5].) The general public ought not to lose confidence in the legal system from the actions taken by LAS in the G. case. Contrary to the arguments raised by Ms. G., the screening protocols used by LAS overcome any appearance of impropriety in this case. Several factors lead to this conclusion. (See Holcombe v Quest Diagnostics, Inc., 675 F Supp 2d 515, 519 [ED Pa 2009].) First, by counsel’s own concession (Ross affirmation 1Í11), Ms. G. has no recollection of meeting or working with an attorney (from LAS or otherwise) when she was in foster care; this suggests that the relationship she had with them was insubstantial from her perspective and seriously undermines any claim that she feels betrayed by LAS. More importantly, from the objective perspective of the general public, the appearance of impropriety, if any, is minimal when the law firm in question had such an insubstantial relationship with the former client that the client does not even remember it. Second, the Juvenile Rights Practice at LAS is very large, consisting of over 100 lawyers, only two of whom are disqualified from working on the current case. Third, according to LAS, the screen in this case was erected from the moment the Bronx case was filed, and LAS attorneys have represented that there has been absolutely no contact by Ms. Nevergold with any information from the prior matter.
Finally, it bears noting that this case was initially filed in April 2012 and fact-finding has not yet concluded. The child has been in temporary foster care since the inception of the case, which means she has been away from her mother for about half of her young life. The initial hearing was mistried when Ms. G. had a breakdown with her first lawyer, who was relieved. She asked for a section 1028 hearing in the middle of the second fact-finding. The instant motion, if granted, would only lead to more delays and greater prejudice to the child. This prejudice, *944 “while not of paramount importance, cannot be disregarded or minimized here.” (Nimkoff, 18 AD3d at 346.)
Conclusion
The court is satisfied that the continued representation of Ms. G.’s child by LAS is appropriate, so long as all LAS personnel who work on this case continue to avoid any contact with the LAS records relating to its prior representation of Ms. G. herself and that those staff who worked on Ms. G.’s matter in Queens screen themselves off from having anything to do with the current matter in the Bronx.
Based on the foregoing, it is hereby ordered: (1) motion No. 1 is denied. (2) LAS attorneys Renee Mitler and Tara Famular are disqualified from representing Jalicia G. They are directed to isolate themselves from any and all conversations or interactions relating to the current LAS representation of Jalicia G., and to refrain from disclosing any confidential information concerning their representation of Jacquelin G. to anyone at LAS. In accordance with rule 1.0 Comment (9), they are directed to file an affirmation with this court by September 30 acknowledging their obligation not to communicate with any other LAS staff about their representation of Ms. G. or the present matter in Bronx Family Court involving Ms. G.’s daughter. (3) LAS attorneys Patricia Nevergold and Dawne Mitchell, and any other personnel from LAS who may have interacted in any way with the LAS representation of Jalicia G., are directed to refrain from seeking out any confidential information concerning the prior LAS representation of Jacquelin G.

. As of the date of this ruling, a decision on the fact-finding as to Mr. W. has not been rendered.

. Respondent requested that the court stay all further proceedings in the case pending a decision on the motion to disqualify LAS. The court denied this, finding that the harm of proceeding with the case was outweighed by the likelihood that the motion would fail on the merits. Respondent then sought a stay of all proceedings in the Family Court from the Appellate Division, which denied the application without prejudice to its renewal once the motion to disqualify LAS was decided.

. Following the denial of respondent’s stay application, the section 1028 hearing continued with further testimony on June 20, 25, and 27, and July 1 and 2, and the court issued its decision on July 8. The fact-finding hearing continued on August 16, and the next date is September 30.

. Insofar as Ms. Seerantan is no longer employed by LAS, there is no risk that she would be involved in the child’s current case in Bronx Family Court.

. Ms. Nevergold never sought out any information about Ms. G. from Legal Aid’s institutional history, because she had no idea that LAS previously represented Ms. G. When she was first assigned the case, she was told that there was “no conflict.”