**REGALO INTERNATIONAL, LLC, Plaintiff,**

v.

**MUNCHKIN, INC., Defendant.**

**Civil Action No. 15-1103-LPS-CJB**

United States District Court, D. Delaware.

Signed September 29, 2016

Dennis James Butler, Panitch Schwarze Belisario & Nadel LLP, Wilmington, DE, Bryon T. Wasserman, Kimberly Chotkowski, Pro Hac Vice, for Plaintiff.

David M. Fry, Shaw Keller LLP, Wilmington, DE, Robert Cameron Garrison, Travis W. McCallon, Pro Hac Vice, for Defendant.

## MEMORANDUM ORDER

Christopher J. Burke, UNITED STATES MAGISTRATE JUDGE

Before the Court is Defendant Munchkin, Inc.'s ("Defendant" or "Munchkin") "Motion to Disqualify Plaintiff's Counsel Panitch, Schwarze, Belisario & Nadel LLP" (the "Motion"). (D.I. 13) For the reasons set forth below, Defendant's Motion is DENIED.

## I. BACKGROUND

### A. Procedural Background

Plaintiff Regalo International, LLC ("Plaintiff" or "Regalo") filed this patent infringement action against Munchkin on November 30, 2015. (D.I. 1). In the Complaint, Regalo accuses Munchkin's MK0032 Toddler Safety Bed Rail and Munchkin's MKCA0509 Bedrail (collectively, the "accused products" or the "Sleep bedrail product") of infringing three Regalo patents. (*Id*; D.I. 19 at 7)

After filing an Answer on January 20, 2016, (D.I. 9), Munchkin filed the instant Motion on March 1, 2016, (D.I. 13). In filing the Motion, Munchkin asserted that, because the law firm Panitch, Schwarze, Belisario & Nadel LLP (hereinafter, "Panitch" or the "Panitch firm") represented Munchkin in the past on numerous trademark matters, Panitch may not now represent Regalo in this case.

Chief Judge Leonard P. Stark referred the Motion to the Court for resolution on March 2, 2016. (D.I. 16) The Motion was fully briefed by March 31, 2016, (D.I. 29), and the parties submitted additional letters regarding the Motion in June 2016, (D.I. 47, D.I. 50). The Court heard oral argument on the Motion on September 15, 2016.

### B. Factual Background

It is undisputed that Panitch represented Munchkin from January 2008 until December 2014. (D.I. 15, Declaration of Laura Genovese ("Genovese Decl.") at ¶¶ 9-10) Panitch's past representation of Munchkin coincided with, and was largely due to, Panitch's employment of Laura Genovese.

(Genovese Decl. at ¶¶ 3-4) Ms. Genovese, an attorney, began working at Panitch in January 2008, and was a partner at the firm from January 2012 until her departure in December 2014.

Ms. Genovese's relationship with Munchkin predated her employment at Panitch. In fact, from the time Munchkin came into existence in or about 1991, Ms. Genovese has served as Munchkin's "outside global trademark counsel." (*Id.* at ¶¶ 4-5) In that role, she has "handled or been involved in virtually every one of Munchkin's trademark applications in the United States and abroad," as well as "numerous trademark opposition proceedings on Munchkin's behalf." (*Id.* at ¶ 5) Ms. Genovese left Panitch in December 2014 to start a new law firm, K & G Law, LLC ("K & G"), and took the Munchkin client relationship with her; since that month, Panitch has not billed any time to Munchkin. (Genovese Decl. ¶ 9; Declaration of Dennis Butler ("Butler Decl."), D.I. 22 at ¶¶ 8-10)

During the time Ms. Genovese worked at Panitch, Panitch's work for Munchkin largely consisted of trademark matters handled by three legal professionals: Ms. Genovese, Maureen Kassner (an attorney who left Panitch to start K & G Law with Ms. Genovese), and Christine Smith (a paralegal who also now works at K & G Law with Ms. Genovese and Ms. Kassner). (Butler Decl. at ¶¶ 9, 11; Declaration of Patricia Smink Rogowski ("Rogowski Decl."), D.I. 21 at ¶¶ 5, 7; D.I. 19 at 4) From February 2008 to December 2014, Panitch attorneys spent approximately 1, 480 hours working on Munchkin matters, and Panitch invoiced Munchkin approximately $667, 267 for this legal work. (But-

ler Decl. at ¶ 8; Genovese Decl. at ¶ 10) Ms. Genovese, Ms. Kassner and Ms. Smith entered 1, 370.7 of these hours (or approximately 93% of the total). (Butler Decl. at ¶ 9)

The remaining time billed by Panitch attorneys and staff during this period— amounting to approximately 110 hours of work—was dispersed among a few other legal professionals. Over 90 hours (or approximately 6%) of the total were entered by Panitch attorneys and staff who departed Panitch prior to the departures of Ms. Genovese, Ms. Kassner, and Ms. Smith. (*Id.* at ¶ 11) Ronald Panitch, the only current Panitch partner who has billed Munchkin, billed 0.4 hours in September 2010. (*Id.* at ¶ 5) Keith Jones, a current Panitch associate who has performed work for Regalo in this case (*see* D.I. 46, D.I. 47, D.I. 50), billed Munchkin 14.1 hours for work performed between September 30 and October 26, 2013, on a single trademark opposition matter. (Declaration of Keith Jones ("Jones Decl."), D.I. 23 at ¶ 4; Butler Decl. at ¶ 7)[1] Lastly, two current, non-attorney Panitch staff members billed 3.3 hours for work taking place in 2008, 2012 and 2013. (Butler Decl. at ¶ 6)

All (or nearly all) of the above work performed by Panitch for Munchkin from February 2008 to December 2014 related to trademark matters. There is no record evidence indicating that Panitch performed any work for Munchkin on patent matters during this time, such as patent prosecution, patent licensing, patent clearance work, patent post-grant review or patent litigation. (Declaration of Frederick A. Tecce ("Tecce Decl."), D.I. 20 at ¶ 18)[2]

---

1. Mr. Jones indicated that he spent most of this time (11.5 hours) reviewing the opposing party's documents, and the remaining 2.6 hours compiling and producing Munchkin's documents and discussing discovery requests with Ms. Genovese. (Jones Decl. at ¶ 4)

2. At oral argument, counsel for Regalo stated that a public PACER search conducted after the parties submitted their briefing on the Motion revealed that Ms. Genovese had entered an appearance in one Munchkin patent case during her tenure at Panitch. However,

Additionally, it is uncontested that none of Panitch's work for Munchkin (including Ms. Genovese's trademark work) involved the accused products at issue in this litigation. (*Id.* at ¶¶ 18-19)

During the course of her work as Munchkin's outside global trademark counsel, Ms. Genovese was frequently exposed to a significant amount of Munchkin's confidential business information. (Genovese Decl. at ¶ 6) This included "information concerning not only Munchkin's trademark portfolio and corresponding strategies, but also related issues like Munchkin's licensing positions and strategies, product development and placement strategies, and overall market position strategies." (*Id.*) Ms. Genovese also "participated in and assisted with strategy development, factual discovery, and document production in certain Munchkin litigation matters." (*Id.* at ¶ 7) Additionally, she had "frequent contact" with Munchkin's Vice President and General Counsel, Petty Rader, and had "relatively frequent contact" with Munchkin's Chief Executive Officer ("CEO") and President, Steven Dunn, and other Munchkin officers and business managers. (*Id.* at ¶ 8)

Although Ms. Genovese was the linchpin of the Panitch-Munchkin relationship, she did share information about Munchkin with other attorneys at the firm. For example, she states that on multiple occasions she conveyed information about "Munchkin's business and its active and prospective intellectual property matters" during Panitch partner meetings. (*Id.* at ¶ 12) Ms. Genovese believes that a number of the partners who attended these meetings are still partners at Panitch today. (*Id.*)

The only specific conversation with a Panitch partner that Ms. Genovese has recounted involves a discussion she had with Frederick Tecce, who represents Regalo in this matter.[3] In the fall of 2012, Ms. Genovese helped Mr. Tecce to prepare for a meeting with Mr. Dunn and Ms. Rader. (Tecce Decl. at ¶ 10; Genovese Decl. at ¶ 11) Mr. Tecce was to meet with the two to discuss whether Panitch might represent Munchkin in additional, non-trademark, litigation matters—and in particular a false marketing and advertising case (involving diaper pail advertising) to which Munchkin was then a party. (Tecce Decl. at ¶ 10; Genovese Decl. at ¶ 11) Ms. Genovese states that, prior to Mr. Tecce's meeting with Munchkin, she spoke to Mr. Tecce about "Munchkin's business and intellectual property[,]" as well as its "litigation activities, including specifically its litigation philosophies, decision-making, and prior strategies in intellectual property cases." (Genovese Decl. at ¶ 11) Mr. Tecce, for his part, notes that none of the information that Ms. Genovese shared during this conversation was "related to" the subject matter of the instant case or the accused products at issue here. (Tecce Decl. at ¶ 12)

After his conversation with Ms. Genovese, Mr. Tecce traveled to California to meet with a number of Panitch's then-current clients, including Munchkin, as well as other clients for whom he had done work in the past. (*Id.* at ¶ 9) He testifies that at the Munchkin meeting with Mr.

---

Panitch's billing records do not reflect any work billed for this matter.

3. This is not the first time Mr. Tecce has represented Regalo in a patent litigation matter. In his declaration, he stated that he has represented Regalo in various patent litiga-

tion matters for more than 18 years, and that he served as lead counsel in a patent litigation action filed in the United States District Court for the District of Minnesota in which Regalo asserted two of the patents-in-suit against a third party. (Tecce Decl. at ¶¶ 6-8)

Dunn and Ms. Rader, the "entire conversation focused on" the false advertising litigation. (*Id.* at ¶ 14) Mr. Tecce recalls that, during the course of this discussion, Mr. Dunn described his "litigation philosophy" as being "summed up" by the two-word phrase: "[g]et even." (*Id.* at ¶ 17)

Ultimately, Munchkin did not retain Panitch to litigate new, non-trademark matters (including the false advertising litigation matter) after Mr. Tecce's meeting with Mr. Dunn and Ms. Rader. (*Id.* at ¶ 18) Mr. Tecce states that he has not spoken with anyone at Munchkin since this meeting. (*Id.*)

When Ms. Genovese left the Panitch firm in December 2014, Panitch transferred all of its Munchkin paper records to Ms. Genovese's new firm. (Rogowski Decl. at ¶ 13) Panitch retained copies of Munchkin files in its electronic document management system. (Tecce Decl. at ¶ 13) Mr. Tecce had access to the Munchkin files in Panitch's document management system up until the time when Munchkin filed the instant Motion; thereafter, the firm configured this system so that no Panitch personnel could obtain access to Munchkin's records. (*Id.*) Mr. Tecce states that although he had access to these Munchkin files prior to the filing of the instant Motion, he has not searched for or reviewed any of those documents since Ms. Genovese's departure from the Panitch firm. (*Id.*)

## II. LEGAL STANDARD

▮ The Court has the inherent authority to supervise the professional conduct of attorneys appearing before it, including the power to disqualify an attorney from a representation. *See United States v.*

*Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980).[4] Attorney conduct is governed by the ethical standards of the court before which the attorney appears. *See In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 160 (3d Cir. 1984); *Intellectual Ventures I LLC v. Checkpoint Software Techs. Ltd.*, Civ. No. 10–1067–LPS, 2011 WL 2692968, at *5 (D. Del. June 22, 2011) ("*Intellectual Ventures I*"). The United States District Court for the District of Delaware has adopted the Model Rules of Professional Conduct of the American Bar Association. *See* D. Del. LR 9010-1; *see also Intellectual Ventures I*, 2011 WL 2692968, at *5. Model Rule of Professional Conduct 1.9 ("Rule 1.9") outlines the extent of a lawyer's duty to avoid representations that conflict with the interests of former clients. It provides that:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

Model Rules of Prof'l Conduct ("M.R.P.C.") r. 1.9(a) (Am. Bar Ass'n 2014). To establish that a representation violates this rule, a moving party must show that: (1) the lawyer had an attorney-client relationship with the former client; (2) the present client's matter is the same or "substantially related" to the matter the lawyer worked on for the former client; (3) the interests of the second client are materially adverse to the interests of the former client; and (4) the former client did not consent to the representation after consultation. *Intellectual Ventures I*, 2011

---

4. In this patent matter, the law of the regional circuit (here the United States Court of Appeals for the Third Circuit) applies, as motions to disqualify raise issues that are not unique to patent law. *See In re ATopTech, Inc.*, 565 Fed.Appx. 912, 913 (Fed. Cir. 2014); *Apeldyn Corp. v. Samsung Elecs. Co., Ltd.*, 693 F.Supp.2d 399, 408 (D. Del. 2010).

WL 2692968, at *5; *Apeldyn Corp. v. Samsung Elecs. Co., Ltd.*, 660 F.Supp.2d 557, 561 (D. Del. 2009).

Pursuant to Model Rule of Professional Conduct 1.10 ("Rule 1.10"), an individual attorney's conflicts of interest are generally imputed to all of the other attorneys practicing at the same firm. *See* M.R.P.C. r. 1.10(a). Even after an attorney leaves a firm, the firm may not represent a person with interests materially adverse to those of a client represented by the previously-associated attorney if the matter is "the same or substantially related to that in which the formerly associated lawyer represented the client" and "any lawyer remaining in that firm has information protected by Rules 1.6 and 1.9(c) that is material to the matter." M.R.P.C. r. 1.10(b). Essentially, Rule 1.10 "incorporates the rules for disqualification for an individual attorney as spelled out in Rule 1.9 and applies them to [an] entire firm[.]" *Nemours Found, v. Gilbane, Aetna, Fed. Ins. Co.*, 632 F.Supp. 418, 425 (D. Del. 1986).

As the Third Circuit has explained, Rule 1.9 is a "prophylactic rule" meant to avoid "even the potential that a former client's confidences and secrets may be used against him[,]" in order to maintain "public confidence in the integrity of the bar[,]" and to fulfill a client's rightful expectation of "the loyalty of his attorney in the matter for which he is retained." *Corn Derivatives*, 748 F.2d at 162. Therefore, disqualification is proper under the "substantial relationship" standard "when the similarity in the two representations is enough to raise a common-sense inference that what the lawyer learned from his former client will prove useful in his representation of another client whose interests are adverse to those of the former client." *Intellectual Ventures I*, 2011 WL 2692968, at *5 (internal quotation marks and citation omitted);

*see also Sonos, Inc. v. D & M Holdings Inc.*, Civil Action No. 14–1330–RGA, 2015 WL 5277194, at *2 (D. Del. Sept. 9, 2015).

▮▮▮ Nevertheless, disqualification is disfavored, and the Court approaches motions to disqualify counsel with "cautious scrutiny," mindful of a litigant's right to the counsel of its choice. *Intellectual Ventures I*, 2011 WL 2692968, at *4–5 (internal quotation marks and citation omitted); *see also Miller*, 624 F.2d at 1201. As such, a moving party has the burden to demonstrate that "continued representation would be impermissible." *Sonos*, 2015 WL 5277194, at *1 (quoting *Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc.*, 491 F.Supp.2d 510, 513 (D. Del. 2007)); *see also Intellectual Ventures I*, 2011 WL 2692968, at *5. "[V]ague and unsupported allegations are not sufficient to meet this standard." *Conley v. Chaffinch*, 431 F.Supp.2d 494, 496 (D. Del. 2006) (quoting *Cohen v. Oasin*, 844 F.Supp. 1065, 1067 (E.D.Pa. 1994)). In evaluating whether disqualification is warranted, a court must "carefully sift all the facts and circumstances" before making a final determination in a particular case. *Intellectual Ventures I*, 2011 WL 2692968, at *6 (internal quotation marks and citation omitted); *see also Sonos*, 2015 WL 5277194, at *3.

## III. DISCUSSION

In assessing the instant Motion, the Court's work is made easier by the fact that it is undisputed that Munchkin has established three of the four elements required to demonstrate a violation of Rule 1.9. It is undisputed that Munchkin is Panitch's former client, (*see e.g.*, D.I. 19 at 4), and that Munchkin's interests are adverse to those of Panitch client Regalo in this matter, (*see* D.I. 14 at 6; *see generally* D.I. 19). It is also undisputed that Munchkin did not consent to Panitch's representation of Regalo, nor did Panitch seek Munch-

kin's consent. (D.I. 14 at 4; *see generally* D.I. 19)

Therefore, the Court's focus here will be on determining whether this matter is "substantially related" to those matters in which Panitch represented Munchkin in the past. That is because although Ms. Genovese no longer works at Panitch, and although Munchkin is not a current Panitch client, Rule 1.10 could still prohibit Panitch from representing Regalo in this matter if that representation is deemed "substantially related" to Ms. Genovese's prior representation of Munchkin while she worked at Panitch. *See* M.R.P.C. Rule 1.10(b)(1); (D.I. 14 at 6).[5]

### A. Assessing Whether the Representations are Substantially Related to Each Other

■ In assessing whether two matters are "substantially related" for purposes of Rule 1.9 (and Rule 1.10), courts consider three questions:

(1) What is the nature and scope of the prior representation at issue? (2) What is the nature of the present lawsuit against the former client? [and] (3) In the course of the prior representation, might the client have disclosed to his attorney confidences which could be relevant to the present action? In particular, could any such confidences be detrimental to the former client in the current litigation?.

*Madukwe v. Delaware State Univ.* 552 F.Supp.2d 452, 458 (D.Del.2008) (quoting *Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington*, 652 F.Supp. 1281, 1283 (D. Del. 1987)) *see also Intellectual Ventures I*, 2011 WL 2692968, at *5; *Talecris*, 491 F.Supp.2d at 514.

■ The first two of these questions involve a comparison between the nature of the prior representation(s) at issue and the nature of the present suit. Here, the parties have no real dispute that there is no overlap between the specific facts or law at issue in this case and that at issue in any of Panitch's prior representations of Munchkin. Panitch's prior work for Munchkin consisted of trademark counseling and licensing, whereas this case is a patent litigation. This case pertains to Munchkin's Sleep bedrail product, and it is undisputed that Panitch did not do work related to this product in the past. (*See* Tecce Decl. at ¶ 19)

Despite this apparent lack of factual or legal overlap between the respective representations, Munchkin asserts that they are nevertheless sufficiently related for purposes of the Rule 1.9 analysis. First, it notes that both sets of representations involve "intellectual property" matters. (D.I. 14 at 6) And from there, Munchkin argues that Ms. Genovese's involvement with Munchkin's trademark matters was so "broad and deep" that through them she obtained high-level knowledge that would be relevant to *any kind* of intellectual property litigation—concerning *any* Munchkin product. (*Id.* at 6–8) In the course of handling "*hundreds* of matters for Munchkin[,] requiring continuous, specific advice in relation to innumerable unique issues," Munchkin argues, Ms. Genovese gained knowledge of Munchkin's "litigation philosophies, strategies, and risk tolerances—particularly in the context of intellectual property actions[.]" (*Id.* at 2, 8 (emphasis in original); *see also* Genovese Decl. at ¶¶ 7, 11)

---

**5.** As noted above, if such a substantial relationship is demonstrated, then pursuant to Rule 1.10, Munchkin would also need to show that at least one "lawyer remaining in the firm [i.e., Panitch] has information protected by Rules 1.6 and 1.9(c) that is material to [this] matter." M.R.P.C. 1.10(b)(2). For reasons that will become clear below, the Court need not separately address this portion of Rule 1.10 in this Memorandum Order.

As to the third question in the Rule 1.9/"substantially related" analysis— whether Munchkin may have disclosed confidences to Panitch in the prior representation that could be "relevant to the present action" or "detrimental to" Munchkin in the current case—Munchkin also argues that the answer is "yes." It claims that Ms. Genovese's communication of Munchkin's high-level philosophies and strategies to her partners at Panitch could be relevant and useful to Regalo in the present action. (D.I. 14 at 8 (asserting that such knowledge "implicates virtually every aspect of Regalo's current action against Munchkin")) More specifically, Munchkin notes that Ms. Genovese shared this type of information with Mr. Tecce (Regalo's counsel in this case) once in the past, specifically to "better position [him] to obtain work from Munchkin that is exactly like the work [he] is now doing for Regalo—and *against* Munchkin." (*Id.* (emphasis in original))

The Court, however, has not been persuaded that (1) the prior and current representations are sufficiently related for purposes of this inquiry, nor that (2) Munchkin has met its burden to demonstrate that any Munchkin confidences previously disclosed to Panitch are sufficiently "relevant" to the present action or sufficiently "detrimental" to Munchkin in this case. After all, pursuant to the Model Rules of Professional Conduct, "[i]n the case of an organizational client, general knowledge of the [former] client's policies and practices ordinarily will not preclude a subsequent representation[.]" M.R.P.C. r. 1.9, cmt. 3. Perhaps for this reason, judges in this District have tended not to give great weight in this analysis to unfocused concerns that a party's former counsel

knows that party's "playbook." Instead, in the main, they tend to require a party who is moving to disqualify counsel in a patent matter to demonstrate a fairly close legal and factual nexus between the present and prior representations.

A good example of a patent case in which this Court found that the lack of a strong factual and legal nexus mandated denial of a disqualification motion came in *Sonos, Inc. v. D & M Holdings Inc.*, Civil Action No. 14–1330–RGA, 2015 WL 5277194 (D. Del. Sept. 9, 2015). In *Sonos*, this Court denied defendants' motion to disqualify plaintiff's counsel ("Lee Sullivan") from a patent litigation. The Lee Sullivan attorneys had previously represented the defendants in other patent litigation matters, with those prior representations having ending approximately five years before the *Sonos* case was filed. *Sonos*, 2015 WL 5277194, at *4. The *Sonos* Court noted that although Lee Sullivan's prior representation of defendants had been in the field of patent litigation, those matters had involved "different patents and different products" from what was at issue in the present suit. *Id.* In light of that, the *Sonos* Court concluded that "anything the Lee Sullivan attorneys worked on [in the past] for Defendants ... is not substantially related to their [current] representation of Plaintiff" and that "no confidential information disclosed in prior cases would be relevant to the patents or technology in suit." *Id.* Importantly, the Court concluded by noting that "[a]t most, Defendants disclosed their general strategy for handling patent litigation [to the Lee Sullivan attorneys in the past], which is not enough to warrant disqualification." *Id.*[6] Thus, in *Sonos*, even though there was some overlap among the legal issues be-

**6.** *See also Walker Dig. LLC v. Axis Commc'ns, AB*, Civil Action No. 1:11–cv–558–RGA, 2012 WL 5878668, at *1 (D. Del. Nov. 21,2012) (denying the plaintiff's motion to disqualify a

defendant's counsel in a patent litigation, where an attorney for the defendant had previously represented the plaintiff on patent prosecution matters while working at another

tween the prior and current representations (in that both involved patent litigation matters), the lack of factual overlap was fatal to the disqualification motion—even where the attorney in question was exposed to some understanding of the prior client's "general strategy."

On the other hand, a good example of a patent case where a close factual and legal nexus *was* established is *Innovative Memory Sols. v. Micron Tech., Inc.*, Civil Action No. 14–1480–RGA, 2015 WL 2345657 (D. Del. May 15, 2015). In that case, the defendant sought to disqualify the plaintiff's law firm, due to the prior work that two of the firm's lawyers ("Powers and Cherensky") performed for defendant. *Innovative Memory Sols.*, 2015 WL 2345657, at *3. This Court found that the current representation was substantially related to Powers' and Cherensky's prior work for the defendant, in light of the fact that the two had represented the defendant in 11 prior patent and trade secret cases over a term of 14 years—and seven of those cases involved the NAND flash technology that was the very technology at issue in the present litigation. *Id.* at *3–5. Additionally, in the instant matter, the Court noted that Powers and Cherensky would likely have had to depose a number of defendant's witnesses, with whom they worked closely during the course of their prior represen-

tation of defendant. *Id.* In light of Powers's and Cherensky's own "lengthy and involved experience with [the defendant and a company defendant had acquired] and the factual overlap between past and present representations," the Court found disqualification appropriate. *Id.* at *5.[7]

Thus, the outcomes in patent cases like these have tended to turn on whether there is an understandable connection between prior patent work done by the law firm at issue and the patents or technology areas at issue in the current litigation. Outcomes like these (1) protect client confidences from being used against that client in clearly related matters; but (2) do not sanction disqualification as to "any … relationship that might make a former client feel anxious." *Nemours*, 632 F.Supp. at 426.

Munchkin, however, cites prominently to one patent case from this Court where counsel was disqualified, and where this Court purportedly took "a more practical approach to evaluating factual similarity": *Intellectual Ventures I LLC v. Checkpoint Software Techs. Ltd.*, Civ. No. 10–1067–LPS, 2011 WL 2692968 (D. Del. June 22, 2011). (D.I. 29 at 4; *see also* D.I. 14 at 4-9; D.I. 29 at 2-5, 7-10) Munchkin claims that *Intellectual Ventures I* demonstrates that disqualification can be appropriate in situations other than "when the attorneys being

---

firm ("Morgan & Finnegan") 15 years prior, because that prior work did not involve the patents-in-suit at issue in the current matter, and because "[w]hile [plaintiff] may have disclosed more general confidences to other Morgan & Finnegan attorneys, *such as general patent prosecution or claim drafting strategies, such confidences are not relevant to this action, which involves different patents and a different subject matter, and in which the patents' scope is to be drawn from intrinsic and extrinsic evidence, not [plaintiff's] subjective intent or business strategy*") (emphasis added).

**7.** *See also Apeldyn*, 693 F.Supp.2d at 402–06 (granting defendant's motion to disqualify

plaintiff's counsel based on a substantial relationship between the present patent litigation and a prior patent case in which plaintiff's counsel represented defendant, given that both cases related to the same technology and that plaintiff's counsel had, in the earlier case: billed defendant more than 4,000 hours over more than three years, analyzed the patents-in-suit in the later case, "contribut[ed] theories regarding claim construction and invalidity[,]" and obtained exposure "to factors that [defendant] consider[ed] important in settlement") (internal quotation marks and citations omitted).

challenged have personally worked on *patent matters* for the opposing party involving the *same* patents or *same* technology' as that now at issue[.]" (D.I. 29 at 2-3 (emphasis in original) (citations omitted)) Yet even if this were an accurate summary of the case (and, for reasons set out below, it is not clear that it is), *Intellectual Ventures I* would still not help Munchkin here, as the facts in *Intellectual Ventures I* are not similar to those at issue in this case.

In *Intellectual Ventures I*, the Court disqualified a law firm ("Wilson Sonsini") from representing the defendants in a patent litigation, due to the nature of the firm's prior work on behalf of the plaintiff. The instant infringement case involved four patents-in-suit, and it was not disputed that Wilson Sonsini's prior work for plaintiff had not involved *patent litigation* work regarding those four patents. *Intellectual Ventures I*, 2011 WL 2692968, at *7. Defendants argued, therefore, that Wilson Sonsini attorneys had not previously "learn[ed] any confidential information about any of [plaintiff's] patents or litigation strategy" during the prior representation and that "because [Wilson Sonsini] never provided legal advice in the context of litigation involving patent infringement, its prior representation of [plaintiff] cannot be substantially related to a patent infringement lawsuit." *Id.* at *7–8.

In rendering its decision, the *Intellectual Ventures I* Court disagreed with Wilson Sonsini's assertions that, in order for disqualification to be proper, the firm must have previously provided "legal advice in the context of litigation involving patent infringement" or even that there must necessarily be "a 'factual nexus' between the prior representation and the current representation." *Id.* at *8–9. The Court noted, however, that when considering the similarity of both the particular "legal issues *and* the factual issues" at play there, disqualification was warranted. *Id.* at *9 (emphasis in original). Among these were the following:

(1) The plaintiff itself had been co-founded by a former Wilson Sonsini partner, and Wilson Sonsini had been deeply involved in every aspect of plaintiff's formation as an entity;

(2) Wilson Sonsini's prior representation of the plaintiff was "broad in nature and extensive in scope[,]" involving 21 lawyers over the course of more than six years and implicating more than $2.6 million in fees;

(3) The subject matter of the prior representation overlapped with the instant case, in that the plaintiff's business was "about intellectual property rights" and Wilson Sonsini attorneys had previously advised the plaintiff on patent licenses, patent licensing strategy and patent litigation strategy—such that the current litigation was itself "part of [plaintiff's] licensing strategy" and that "the possibility that [plaintiff] would one day be involved in patent litigation was among the broad topics on which [plaintiff] relied on [Wilson Sonsini] for legal representation";

(4) Wilson Sonsini attorneys had negotiated all but one of plaintiff's portfolio patent licenses over a seven-year span, including licenses to the patents that were involved in the instant suit;

(5) The two attorneys who had performed the most significant of this prior work for plaintiff still worked at Wilson Sonsini at the time of suit;

(6) Plaintiff explained how Wilson Sonsini's past access to confidential information regarding the value plaintiff placed on its patent license portfolio would be "substantially related to damages [in the instant case] (including the determination of a reasonable royalty)"; and

(7) Plaintiff explained how Wilson Sonsini's knowledge of plaintiff as an entity and whether plaintiff would be exposed

to undue risk in litigation was relevant to the question of whether an injunction should be issued in the instant case, since one element of the injunction analysis would be "the nature of [plaintiff] as an entity, e.g., as a practicing or non-practicing entity." *Id.* at \*1–3, \*10–11. In the end, the *Intellectual Ventures I* Court was persuaded that because Wilson Sonsini had been "involved intimately in every aspect of [the plaintiff's] formation, patent licensing practices, negotiation of patent licenses, strategies for potential patent litigation, and ways of mitigating the risk of patent litigation[,]" it was a "common sense inference" that the firm's past representations of the plaintiff would prove relevant and harmful to the plaintiff in the current patent litigation. *Id.* at \*11–12.

The unique factual and legal circumstances of *Intellectual Ventures I* much more compellingly favored disqualification than do those at issue here. While Ms. Genovese's and Panitch's representation of Munchkin was long-standing and substantive, only she and one other Panitch attorney were responsible for the bulk of this work—work that was limited to one subject matter area (trademark law). In contrast, in *Intellectual Ventures I*, Wilson Sonsini's representation of the plaintiff was not only more significant in terms of the number of attorneys involved and the amount billed, but it was also directly tied to the company's very existence as a patent assertion entity, as the firm had literally helped create the plaintiff and had shepherded the company through its early years of existence. Additionally, here Panitch performed no work for Munchkin with regard to the general subject matter of this case (patent law), let alone any work tied to the specific patents or products at issue in this litigation. (Tecce Decl. at ¶ 18) In contrast, in *Intellectual Ventures I*, Wilson Sonsini's work was not only deeply enmeshed in the subject of *patent* licensing and litigation strategy, but a Wilson Sonsini attorney had negotiated licenses to a patent portfolio that included the patents-in-suit.

For all of the reasons set out above, the Court concludes that Munchkin has not demonstrated the requisite substantial relationship. Indeed, if the generalized citation to counsel's knowledge of a prior client's "litigation philosophies," "strategies" and "risk tolerances" necessarily demonstrated that the past representations were "substantially related" to any new matter where an attorney is adverse to the prior client, the floodgates for disqualification would open wide.[8] That is, almost *any* kind of prior representation could be said to provide a window into a client's litigation "philosophy" or "strategy." (D.I. 19 at 11) Thus, although there may be no *per se* requirement of a close factual nexus between current and prior representations in patent matters in order for disqualification to be appropriate, *see Intellectual Ventures I*, 2011 WL 2692968, at \*9, here the clear lack of such a nexus helps drive the decision that the Motion should be denied.

**8.** *Cf. Vestron, Inc. v. Nat'l Geographic Soc.*, 750 F.Supp. 586, 595 (S.D.N.Y. 1990) ("Furthermore, the only information that [defendant] is alleged to have revealed during the course of its representation by [counsel at issue] was its general litigation posture in trademark suits. But if insight into a former client's general 'litigation thinking' were to constitute [grounds for disqualification in that contract action], then disqualification would be mandated in virtually every instance of successive representation. That clearly is not the law ...."); *Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F.Supp.2d 381, 393 (S.D.N.Y. 2010) (finding that, where the only allegation of similarity between two trademark cases is "the attorney's alleged insight into the former client's general litigation thinking, similarity is not established") (internal quotation marks and citation omitted).

## B. Ms. Genovese's Conversations with Mr. Tecce and Mr. Tecce's Role in the Litigation

The Court's conclusion here—that disqualification is not warranted—is not altered by the facts of record relating to Ms. Genovese's prior conversations with Mr. Tecce, or by Mr. Tecce's role as counsel for Regalo in this case. Although Mr. Tecce previously had conversations with Ms. Genovese about Munchkin, and although he met with Munchkin's CEO and President Mr. Dunn once in 2012, the record does not sufficiently demonstrate that Mr. Tecce thereby became privy to "confidences which could be relevant to the present action[.]" *Madukwe*, 552 F.Supp.2d at 458.

With regard to Ms. Genovese's preparatory conversation with Mr. Teece in 2012, Ms. Genovese states that in that discussion, she communicated "confidential Munchkin information" to Mr. Teece. (Genovese Decl. at ¶ 11) She states that this involved discussion of "Munchkin's litigation activities, including specifically its liti-

gation philosophies, decision-making, and prior strategies in intellectual property cases." (*Id.*) However, Ms. Genovese does not give (even by way of example) any more specific indication of *what type of* philosophies or strategies were discussed here—the kind of details that might demonstrate that a real link can be drawn between those discussions and material that could actually be useful to Regalo in this case.[9] For his part, Mr. Tecce notes only that in this conversation, he and Ms. Genovese discussed no information directly related to the instant patent litigation. (Teece Decl. at ¶¶ 11-13)[10]

As for the meeting with Mr. Dunn, Mr. Tecce reports that much of the discussion was about the specifics of the particular false advertising case in which Munchkin was then enmeshed. (*Id.* at ¶¶ 14-15) Beyond that, the record indicates that the only other notable discussion came when Mr. Dunn shared his "[g]et even" litigation "philosophy" with Mr. Tecce. (*Id.* at ¶ 17) The communication of such a generic litigation "strategy," without more, cannot be "enough to warrant disqualification." *Sonos*, 2015 WL 5277194, at *4.[11] And Mr.

9. Put differently, there is simply not a sufficient factual record to support Munchkin's allegations that Mr. Tecce's knowledge (through his conversation with Ms. Genovese) "of Munchkin's tendencies and prior strategies could inform everything from how many and what type of claims to bring in this action, to how to pursue discovery, to how to position any settlement strategy, to what witnesses to depose, to how to depose those witnesses." (D.I. 14 at 8); *see also Talecris*, 491 F.Supp.2d at 515 (noting that "the court should not allow its imagination to run free with a view to hypothesizing conceivable but unlikely situations in which confidential information 'might' have been disclosed which could be relevant to the present suit") (internal citations and quotation marks omitted).

10. At oral argument, Defendant's counsel acknowledged that the state of the current record fairly represents the nature of Panitch's prior representations of Defendant.

11. Munchkin faults Regalo and Panitch for even including reference to this exchange with Mr. Dunn in Mr. Tecce's affidavit, arguing that it shows how "Regalo, via Panitch, *is already using* Munchkin's confidences against it, and is therefore shattering any appearance of propriety and undermining the very purposes of the Model Rules." (D.I. 29 at 7-8 (emphasis in original)) However, the Court is not convinced that Panitch's disclosure of the contents of this conversation should be held against it here. Model Rule of Professional Conduct 1.9(c) provides that "[a] lawyer . . . whose present or former firm has formerly represented a client in a matter shall not thereafter . . . use information relating to the representation to the disadvantage of the former client *except as these Rules would permit* or require with respect to a client[.]" M.R.P.C. Rule 1.9(c) (emphasis added). Rule 1.6(b) then lists situations in which a lawyer may reveal confidential information "relating

Tecce never spoke with anyone from Munchkin after this 2012 meeting. (Tecce Decl. at ¶ 18)

Lastly, the Court notes Munchkin's assertion that "given the Panitch firm's recent history as attorneys for Munchkin and Mr. Tecce's more specific knowledge of and contact with Munchkin [in 2012], there is little reason for [Panitch] to put Mr. Tecce on this case, *save the fact that it gives the firm and its client, Regalo, a significant advantage here*." (D.I. 14 at 9 (emphasis in original)) This argument does not withstand scrutiny. Mr. Tecce (along with other Panitch attorneys) has represented Regalo for more than 18 years in numerous and varied patent matters; indeed, Mr. Tecce represented Regalo in a prior patent litigation involving two of the very patents at issue in this case. (Tecce Decl. at ¶¶ 6-8; *see also* D.I. 19 at 8)[12] This experience—as opposed to his having participated in a single meeting with Munchkin's CEO and President four years ago—seems to be by far the most plausible reason for Mr. Tecce's participation in this matter.

## IV. CONCLUSION

It is understandable why this Motion was filed. The nature of Panitch's prior work with Munchkin was of real substance. And one can thus see how Panitch's representation of Munchkin's opponent here would raise eyebrows at (and perhaps the ire of) its former client.[13]

But however "broad and deep" Panitch's representation of Munchkin may have been (*see* D.I. 14 at 6), Munchkin's general description of that representation has not conveyed how Panitch thereby learned confidential information that would prove relevant to the issues in this particular case. As such—and mindful that such motions are generally disfavored, *Intellectual Ventures I*, 2011 WL 2692968 at *4—the Court finds that Munchkin has not met its burden to show that the continued representation would be impermissible, *id.* That is, it has not shown how this patent litigation related to Munchkin's Sleep bedrail product is "substantially related" to Panitch's prior representations of Munchkin in unrelated trademark matters.

For the reasons set forth herein, Defendant's Motion is DENIED.

to the representation of a client[.]" M.R.P.C. 1.6. Rule 1.6(b)(5) permits an attorney to do so to the extent the lawyer reasonably believes necessary to, *inter alia*, "respond to allegations in any proceeding concerning the lawyer's representation of the client[.]" M.R.P.C. 1.6(b)(5). And at least one other court has found that this exception allows attorneys to reveal confidential information relating to the representation of a client in response to a motion to disqualify, to the extent necessary to address any alleged conflicts of interest. *See Dworkin v. Gen. Motors Corp.*, 906 F.Supp. 273, 277–78 (E.D. Pa. 1995).

**12.** Mr. Butler, who also represents Regalo in this case, also previously spent over 200 hours working on Regalo matters since 2012, including representing Regalo in the prior litigation involving two of the patents-in-suit. (Butler Decl. at ¶ 4)

**13.** Panitch's decision not to screen Mr. Tecce from access to Munchkin's client files until after this Motion was filed, (Tecce Decl. at ¶ 13), is also surprising. The lack of such a screen ultimately makes no difference to the outcome of this Motion, in light of the Court's finding that Panitch's current representation of Regalo is not "substantially related" to its past representations of Munchkin. *See* M.R.P.C. r. 1.10 (explaining that screening is only required to avoid imputation of conflicts of interest "prohibited . . . by" Rule 1.9). Nevertheless, it is understandable why Panitch's decision not to earlier implement such a screen, if only for prophylactic reasons, might also have been concerning to Munchkin here.